**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equity Income Partners LP, an Arizona Limited Partnership; Galileo Capital Partners Limited, a Cayman Islands Exempted Company,<br><br>          Plaintiffs,<br><br>v.<br><br>Chicago Title Insurance Company, a Delaware corporation,<br><br>          Defendant. | NO. CV-11-1614-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (Doc. 21). For the reasons discussed below, Plaintiffs' motion is denied.

**BACKGROUND**

On May 10, 2006, Plaintiff Equity Income loaned $1.2 million to Mr. Scott Mead and another $1.2 million to Mr. Keith Vertes (collectively the "Owners"). The Owners each used their loaned funds to purchase a thirteen acre lot of land (the "Properties"). At the time Equity Income made the loans, the Properties were appraised at a value of over $2.9 million. (Doc. 22, ¶ 5; Doc. 26, ¶5). The loans were secured by separate Deeds of Trust on the Owners' respective parcels, which listed Equity Income as the Beneficiary.

1

On May 16, 2006 Equity Income assigned an eighty percent interest in each of the Deeds of Trust to Plaintiff Galileo Capital.

As part of their purchase of the Properties, the Owners purchased title insurance from Transnation Title Insurance Company. Plaintiffs, meanwhile, purchased lender's title insurance from Security Title Agency and Ticor Title Insurance Company covering their secured interests of $2.4 million in the Properties. Plaintiffs' title insurance policies (the "Policies") insured Plaintiffs against "loss or damage, not exceeding the amount of insurance stated in Schedule A, sustained or incurred by the insured by reason of: . . . 3. Unmarketability of the title; [or] 4. Lack of a right of access to and from the land . . ." (Doc. 22-5 at 8, 20).

The Owners allegedly learned in September 2006 that they were not able to legally access the Properties. (Doc. 22, ¶ 13). In January 2007, Plaintiffs submitted a claim to Ticor under their lender's title insurance Policies which apparently sought payment for the Policies' limits and stated that the Properties were unmarketable and valueless without ingress or egress. (*See* Doc. 22-13). On February 1, 2007, Ticor sent Plaintiffs a letter denying their claim which stated, among other things, that "no proof of loss or damage has been provided." (*Id.* at 6–7). This letter further stated that "the current access should not prohibit a foreclosure of the Insured Liens were such an action necessary." (*Id.* at 6).

Within several months of discovering the title defect, the Owners stopped making regular payments on the Loans and were in default. (Doc. 22, ¶ 19; Doc. 26, ¶ 19). The Parties do not dispute that as a result of those defaults Plaintiffs had the right to foreclose on the Deeds of Trust and take back possession of the Properties. (Doc. 22, ¶ 20; Doc. 26, ¶ 20). Plaintiffs chose instead to forego immediate foreclosure based on Transnation's promise to make interest-only payments on the Loans on the Owners' behalf while it

pursued litigation against Maricopa County to cure the defect in the titles. After three years of litigation, the Maricopa County Superior Court granted summary judgment against Transnation. (Doc. 26-1, Ex. 10; Doc. 22-11). At that point, Transnation stopped making payments on the Loans. On January 28, 2011, Plaintiffs obtained title to the Properties at a Trustee's Sale by making a full credit bid.

On July 21, 2011, Plaintiffs commenced this action by filing a Complaint in Maricopa County Superior Court. The Complaint asserts claims against Ticor's successor in interest, Defendant Chicago Title, for breach of contract, breach of the covenant of good faith and fair dealing, and bad faith. (Doc. 1-1, Ex. A). On August 17, 2011, Defendant removed the action to this Court. (Doc. 1). Plaintiffs now move for summary judgment "on the specific legal question of the date on which Plaintiffs' losses occurred for purposes of computing damages." (Doc. 21 at 1). Plaintiffs contend that any losses they incurred as a result of the Properties' alleged defects in title should be measured as of 2006 when the Owners discovered the defects. (Doc. 21). Defendant, meanwhile, argues that Plaintiffs did not suffer any real loss until they foreclosed on the Owners' property in 2011 and that their losses should be measured as of that date. (Doc. 25 at 6–7).

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party*.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (emphasis in original) (quoting *Anderson*, 477 U.S. at 250).

**II.    Analysis**

Title insurance is designed to pay for damages "caused by any defects to title that the title company should have discovered but did not." *Swanson v. Safeco Title Ins. Co.,* 186 Ariz. 637, 641, 925 P.2d 1354, 1358 (App. 1995). "[A] title insurance policy is a contract of indemnity, not one of guarantee. The insurer . . . agrees to indemnify [the insured] to the extent the insured suffers a loss caused by defects in the title or encumbrances on the title." *Karl v. Commonwealth Land Title Ins. Co.*, 20 Cal. App. 4th 972, 978, 24 Cal. Rptr. 2d 912 (1993). *See also Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1063 (1st Cir. 1990) ("[W]hat is insured is the loss resulting from a defect in the security."). "[W]here ambiguity in an insurance contract exists, the policy will be construed against the insurer." *Sec. Ins. Co. of Hartford v. Andersen*, 158 Ariz. 426, 428, 763 P.2d 246, 248 (1988).

1 The Policies in this case insure Defendant "against loss or damage, not exceeding [$2.4 million], sustained or incurred by the insured by reason of: . . . 4. Lack of a right of access to and from the land." (Doc. 22-5 at 8, 20). In other words, Plaintiffs are insured against any monetary loss resulting from the lack of a right of access to the Properties, with a cap on recovery placed at $2.4 million—the amount Plaintiffs loaned the Owners. This is the base amount Plaintiffs have risked for their investment and it therefore serves as the maximum amount of loss for which they can recover under the Policies.

There is nothing in the Policies which suggests that the loss suffered by a lender who has loaned money to third parties to purchase property (based in reliance on the issuance of title insurance) is somehow calculated by the worth of the property at the time of ultimate foreclosure. The Policies state that the insured must submit "a proof of loss or damage . . . within 90 days after [ascertaining] the facts giving rise to the loss or damage." (Doc. 22-5 at 10, 22). Defendant argues that proof of foreclosure is the only valid "proof of loss or damage." (*Id.*). The Policies, however, do not so limit the term "proof of loss or damage," stating only that "[t]he proof of loss or damage shall describe the defect in . . . the title . . . which constitutes the basis of loss or damage and shall state, *to the extent possible*, the basis of calculating the amount of the loss or damage." (Doc. 22-5 at 10, 22) (emphasis added). By stating that Plaintiffs need only calculate the amount in their initial proof of loss "to the extent possible," the Policies account for the fact that although Plaintiffs' losses may not be susceptible to precise calculation at that time, and may be mitigated by the value of the property received at foreclosure, they have nonetheless been incurred.

Many courts—recognizing that a lender's losses may be mitigated where it continues to receive scheduled loan payments or forecloses on its collateral—have properly stated that a lender's actual loss "cannot be determined unless the note is not repaid and the security for the mortgage proves inadequate." *Falmouth Nat'l Bank*, 920 F.2d at 1062–63. *See also First Internet Bank of Indiana v. Lawyers Title Ins. Co.*, 1:07-CV-0869-DFH-DML, 2009 WL 2092782, at *6 (S.D. Ind. July 13, 2009) ("[T]he time of default and foreclosure is when damages should be measured."); *Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 F.Supp. 1252, 1254 (E.D.N.C.1996) ("[A] lender suffers loss only if the note is not repaid".); *Karl*, 20 Cal. App. 4th at 983–84 (1993) ("[I]n the typical case the earliest a loss can be claimed on a lender's policy is at the time of completion of foreclosure."). That Plaintiffs' actual "loss" could not be calculated until foreclosure, however, does not mean that the amount lost by Plaintiffs due to the title defect should be determined by the value of the property at the time of the foreclosure. Rather, the amount of money the lender may have lost may amount up to the $2.4 million it lent the owners to purchase property that was severely impaired at the time of the sale, minus any alleviation of that loss as of the time of completion of foreclosure.[1]

This approach is consistent with that taken by the court in *Citicorp Sav. of Illinois*

---

[1] Defendant contends that Equity received over $1.4 million in interest payments from Transnation that Equity would not otherwise have received, and that it would be inequitable for Equity to reap benefits from both Transnation and from Defendant. These payments, however, were "interest" payments and apparently did not involve the repayment of principal. At any rate, to the extent that the payments may have mitigated Plaintiffs' loss, and may be considered pursuant to applicable law, the question before this court is the date on which the insured loss is incurred, not the date They do not appear, therefore, to have mitigated Defendant's loss of the $2.4 million it lent the Owners.

*v. Stewart Title Guar. Co.* 840 F.2d 526 (7th Cir. 1988). In *Citicorp*, a lender loaned $27,000 to a Mr. Robinson to purchase real property and secured the loan with a lien on the property. *Id.* Pursuant to the lender's title insurance policy, it was entitled to indemnification for losses resulting from "[t]he invalidity or unenforceability of the lien of the insured mortgage." *Id.* at 528. Sometime later, after the value of Robinson's property had sharply declined, the parties discovered that the lien was invalid. *Id.* The title insurer then purchased the property from Robinson for $1,550 and attempted to tender the real estate to the lender to cover the losses resulting from its invalid lien. *Id.* The lender "refused to accept the deed, saying that tender was not a valid option under the policy and [that it] was entitled to $27,000 damages due to the unenforceability of the mortgage lien." *Citicorp*, 840 F.2d at 528.

The court in *Citicorp* ultimately held that "the lender had suffered "$27,000 in damages, the amount [the lender] gave Robinson in reliance upon [the title insurer's] guarantee." *Id.* at 530. The court reasoned that this was the best measure of the lender's damages because the lender "gave Robinson $27,000 on [the title insurer's] promise that the mortgage lien was enforceable" and "would not have extended $27,000 credit to Robinson on the basis of a voidable mortgage." *Id.* The court further reasoned that because "[t]he policy was breached [at the time of the loan]," the title insurer "should [ ] bear any risk of market value decline in the property after that time." *Id.*

In the instant case, as in *Citicorp*, Plaintiffs suffered loss at the time they made the loans in reliance upon the Policies. Defendant "should therefore bear any risk of market value decline in the property after that time." *Citicorp*, 840 F.2d at 530. Defendant may

wish, pursuant to the terms of the Policies, to assert that it is entitled to a credit for the actual value of the Properties with the defect at the time of sale, but in such a case, Defendant would presumably not be arguing to calculate loss based on the Properties' values at the time of foreclosure.

Recognizing a lender's loss as of the time he makes a loan in reliance on title insurance does not conflict with the Arizona Court of Appeals' holding in *Swanson v. Safeco Title Ins. Co.* 186 Ariz. 637, 925 P.2d 1354 (App. 1995). In *Swanson*, the court determined that in the absence of policy language to the contrary, "the insured's loss, if any, is the difference between the fair market value of the property if no impairment existed and the fair market value of the property with the impairment." 186 Ariz. at 641. The court further held that the proper date to use in determining the value of the property was the date the title defect was discovered. *Id. Swanson*, however, addressed owner's title insurance, not lender's title insurance as is at issue in this case. *See id.* And "[t]here is a fundamental distinction between the indemnifiable loss of an insured lender and the indemnifiable loss of an insured owner." *Cale*, 225 Cal. App. 3d at 426. *See also Swanson*, 186 Ariz. at 641–42 (noting that because an owner makes improvements to his property in reliance on good title, he should be reimbursed for any increase in the property value between the time of purchase and the time he discovers a title defect) (citing *Overholtzer v. Northern Counties Title Ins. Co.*, 253 P.2d 116, 125 (Cal. Dist. Ct. App. 1953). As discussed, given the language of the Policies and the fact that this is *lender's* title insurance, the better approach in this case is to recognize Plaintiffs' loss as of the date of the loan and then adjust the amount of that loss pursuant to any mitigating

factors.[2]

A clause in the Policies further limits Plaintiffs' recovery of to "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy." (Doc. 22-5 at 10, 22). Defendant contends that the difference between the value of the "interest as insured and . . . interest subject to the defect" must be measured as of the time of foreclosure. (*Id.*). However, "[a]llowing the insurer to wait to value the [insured interest] in a falling real estate market works to the insurer's benefit, a result that does not construe an ambiguity in the policy in favor of the insured." *In re Evans*, 460 B.R. 848, 899 (Bankr. S.D. Miss. 2011). *See also Sec. Ins. Co. of Hartford*, 158 Ariz. at 428 ("[W]here ambiguity in an insurance contract exists, the policy will be construed against the insurer."). An ambiguous "choice of a date for measuring damages should not provide the insurer with an opportunity to shield its eyes from the insured's actual, economic, and consequential losses." *Id.* (citation omitted). In addition, Defendant's

---

[2] At least one court has implied that in jurisdictions which follow a title theory of mortgages, a lender should be treated as an owner by virtue of the security agreement. *See Falmouth Nat. Bank*, 920 F.2d at 1065 n. 4 ("The plaintiff would not be considered an owner simply by virtue of a security arrangement given that Missouri follows the lien theory of mortgages."). In Arizona, the execution of a deed of trust passes "legal title" to a trustee. *Brant v. Hargrove*, 129 Ariz. 475, 480–81, 632 P.2d 978, 983–84 (Ct. App. 1981). The Arizona Supreme Court has stated, however, that a "deed of trust, although technically granting legal title to trustee, does not grant more than a lien on the property." *City Consumer Services, Inc. v. Metcalf*, 161 Ariz. 1, 4, 775 P.2d 1065, 1068 (1989). Accordingly, "Arizona adheres to the lien theory of mortgages." *Id.* And under a lien theory, a lender, unlike a land owner, is not automatically "entitled to the full market value of the property." *Cale v. Transamerica Title Ins.,* 225 Cal. App. 3d 422, 426 (App. 1990). But due to the terms of the Policies, in this case, whether Plaintiffs' security interest is an ownership interest or a lien is a distinction without a difference.

9

proposed interpretation cuts against the plain terms of the Policies to the extent that the maximum amount insured under the Policies is the amount loaned to purchase the Properties, not the Properties' value at the time of foreclosure. Construing the third clause in favor of the insured, as the Court must, this clause limits Plaintiffs' recovery to the insured interest's value without the defect *at the time it was insured*, minus the value of the interest with the defect.

Defendant lastly contends that because Equity acquired the Properties via a full credit bid, it has not suffered a loss under the Policies. Pursuant to Arizona Revised Statutes ("A.R.S.") § 33-814, a full-credit bid prevents a lender from seeking deficiency damages against a debtor, as "the difference between the amount owed on the debt and the amount bid . . . [is] zero." *ING Bank, FSB v. Mata*, CV-09-748-PHX-GMS, 2009 WL 4672797, at *4 (D. Ariz. Dec. 3, 2009). *See also* A.R.S. § 33-814(A), (D). Section 33-814 also applies to preclude lenders from seeking deficiency damages from third parties. *Mata*, 2009 WL 4672797, at *4 ("Plaintiff chose its price, and it would be unjust to allow it to seek to recover the loan deficiency from a third party after already extinguishing the entire debt at the deed of trust sale."). Even though "the antideficiency statute would prevent [a] plaintiff from seeking a deficiency judgment," however, "it does not preclude an action for recovery of insured losses" brought by a lender against its title insurer. *M & I Marshall & Ilsley Bank v. Wright*, CV-10-1657-PHX-FJM, 2011 WL 2713973, at *4 (D. Ariz. July 13, 2011). Section 33-814 does not, therefore, preclude Equity Income from recovery.

**CONCLUSION**

Given the Policies' language in this case, neither the date of discovery nor the date of foreclosure is an appropriate date as of which to value Plaintiffs' loss. Rather, the appropriate date of loss is the date Equity made the loans.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 21) is **DENIED**.

Dated this 6th day of September, 2012.

*A. Murray Snow*
G. Murray Snow
United States District Judge